## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

CEDEAL T. HARPER,

                Plaintiff,

v.                                     CIVIL ACTION NO.   2:12-cv-00656

CAPTAIN JAMES MCCLOUD, et al.

                Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendants' motion for summary judgment [ECF No. 103] and Plaintiff's second motion to amend his Complaint [ECF No. 99].   For the reasons set forth below, the Court **GRANTS** Defendants' motion for summary judgment and **DENIES** Plaintiff's second motion to amend his Complaint.

### I.     BACKGROUND

This action arises from Plaintiff's allegations that a prison official at the Mt. Olive Correctional Complex in Mt. Olive, West Virginia, a state maximum-security prison, used excessive force in violation of Plaintiff's constitutional right to be free from cruel and unusual punishment under the Eighth Amendment.   The incident at issue in this case concerns Defendant Captain James McCloud's deployment of pepper spray on Plaintiff while Plaintiff was

locked in his cell.   Plaintiff's amended Complaint[1] ("Complaint" or "amended Complaint") alleges an excessive force claim against Defendant Captain McCloud and claims of supervisory liability against McCloud, Ballard, and Rubenstein.   Plaintiff seeks monetary damages, as well as declaratory and injunctive relief.

On October 15, 2012, Defendants' initial motion to dismiss (ECF 25) was granted with regard to Plaintiff's claims for monetary damages against Defendants in their official capacities, but that motion was otherwise denied.   (ECF 40.)   A motion for partial summary judgment (ECF 41), which was filed by Plaintiff on November 7, 2012, was denied as premature on January 22, 2013.   (ECF 73.)   Discovery ensued.

On March 7, 2013, Plaintiff filed the pending motion for leave to file an amended Complaint (ECF No. 99), seeking to add Jason Collins, the Associate Warden of Programs, and Paul Parry, the Associate Warden of Security, as Defendants.   As the potential claims against Mr. Collins and Mr. Parry are exclusively supervisory liability claims, United States Magistrate Judge Mary E. Stanley held that motion in abeyance pending a determination of whether any actionable violation of Plaintiff's constitutional rights by Defendant McCloud had occurred.

On March 15, 2013, Defendants filed the pending motion for summary judgment, with exhibits (ECF 103), and a supporting memorandum (ECF 104).   On March 26, 2013, at the request of the Court, Defendants supplemented their exhibits with complete copies of the

---

[1]   Plaintiff filed his initial Complaint (ECF 2) on March 6, 2012, naming only Defendant McCloud.   Plaintiff was granted leave to amend his Complaint.   His amended Complaint (ECF 11) only adds the supervisory liability claims.   Plaintiff also filed two "Cumulative Supplements" (ECF 34, 59) addressing his supervisory liability claims against Ballard and Rubenstein.   (ECF No. 34.)   These Cumulative Supplements are considered part of the record in support of Plaintiff's amended Complaint.   (ECF No. 62.)

depositions relied upon in support of their motion, rather than the excerpts initially provided. (ECF 110.)

Plaintiff had previously been notified, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), of his right and obligation to respond to any dispositive motion filed by Defendants. (ECF 50.)   On April 3, 2013, Plaintiff filed his response to the motion for summary judgment. (ECF 115.)   On April 30, 2013, Defendants filed a reply memorandum.   (ECF 118.)   This matter is now ripe for adjudication.

## II.    LEGAL STANDARDS

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.   The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).   Material facts are those necessary to establish the elements of a party's cause of action.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.   *Id.*   The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual

3

conclusions to be drawn are in dispute.   *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).   Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:   (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.   Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility.   *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).   Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.   *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).   Inferences that are "drawn from the underlying facts . . . must be viewed in the light

4

most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The party opposing the motion, however, may not rely upon mere allegations or denials of the pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256.

### III. FACTUAL POSITIONS OF THE PARTIES

On January 24, 2012, Plaintiff filed an administrative grievance with the West Virginia Division of Corrections concerning the January 20, 2012, pepper spray incident (ECF 2 at 31.) Plaintiff alleged:

> On or about the 20th of January[,] Petitioner was sprayed with mase [sic] by Captain McCloud. Petitioner feels that excessive force was used and discrimination, violative of Petitioner['s] 8th, 13th and 14th amendment rights. Petitioner was sprayed directly in the face twice by Captain McCloud.

(*Id.*)

On January 26, 2012, McCloud responded to the grievance stating: "Mr. Harper, [t]he force used was to restore and maintain good order in the Unit, not as punishment – [a]ll use of forces [sic] are reviewed by Use of Force Committee." (*Id.*) Captain McCloud's response was upheld on appeal by Warden David Ballard's designee, Jason Collins, Acting Warden, and, thereafter, by Commissioner Jim Rubenstein's office. (*Id.*)

Plaintiff filed his Complaint with this Court on March 6, 2012. (ECF 2.) In the course of discovery, Plaintiff was deposed. During his deposition, Plaintiff acknowledged that he created a disturbance while he was locked in a cell in the prison's punitive segregation unit known as Quilliams II. (ECF 110–1 at 6.) Plaintiff admitted that he repeatedly kicked his cell door in an attempt to get a response from correctional officers concerning his request for some of

his legal paperwork. (*Id.* at 7.) The disturbance spread to other pods in the Quilliams segregation units. (*Id.* at 21.) Two guards responded. (*Id.* at 8.) The guards told Plaintiff that they could not give him the materials he wanted and then departed. (*Id.*) In protest, Plaintiff resumed kicking at his door. (*Id.*) When he received no response, Plaintiff stuffed a towel into his toilet and proceeded to vigorously and repeatedly flush the toilet. This conduct resulted in the flooding of his cell. (*Id.*)

Plaintiff also acknowledged that he did not hear the alarms or buzzing of the doors as Defendant Captain McCloud and Officer Perkins entered into the pod and the area outside Plaintiff's cell. (*Id.*) Plaintiff testified that the first thing he heard was a walkie-talkie and so he turned around. (*Id.*) He was then sprayed in the face with pepper spray through "the bean hole" (that is, the food tray slot in the cell door) by Defendant McCloud who was standing on the opposite side of the cell door. (*Id.*) Plaintiff conceded that he may not have heard any verbal commands from Defendant McCloud because of the noise created by the flushing of his toilet and because he was so focused on that task. (*Id.* at 9.)

Plaintiff also testified about his injuries as a result of being pepper sprayed. He stated that he suffered burning eyes, congestion, a swollen face, bad dreams, and sleep deprivation that lasted for several weeks. (ECF 110–1 at 11.)

Plaintiff attached to his initial Complaint an unsworn statement of inmate Lawrence Stuckey. (ECF 2 at 25.) Mr. Stuckey was housed in a cell near Plaintiff's. According to this statement, Mr. Stuckey observed Defendant McCloud "open the food slot to inmate Harper[']s cell and spray him two (2) times." (*Id.*) Mr. Stuckey stated that neither Defendant McCloud

6

nor any other officer ordered Plaintiff to stop or warn him that he would be sprayed with pepper spray.   (*Id.*)   In the course of this litigation, Mr. Stuckey was deposed and testified that he and Plaintiff were both kicking their doors and flooding their toilets on the night in question.   (ECF 110–3 at 4.)   Mr. Stuckey stated that he saw Defendant McCloud open the door near the section where their cells were located.   (*Id.*)   Mr. Stuckey yelled at Plaintiff "to watch out, that he had the mace."   (*Id.*)   Mr. Stuckey stated that he did not think Plaintiff heard him because "he kept flushing and got sprayed."   (*Id.*)   As with his written statement, Mr. Stuckey testified that Defendant McCloud sprayed Plaintiff twice through the "bean hole."   (*Id.* at 5.)   Mr. Stuckey testified that he did not know how long each of the two bursts of pepper spray lasted, but stated that each was longer than two seconds and that Plaintiff was "drenched in mace."   (*Id.* at 5–6.)

Defendant McCloud testified in his deposition about the incident.   (ECF 110–2.)   He stated that he was the shift commander that night and that the prison was "pretty much on lock down status" because of staffing issues.   (*Id.* at 5.)   He only had the minimum number of officers on duty that evening in Quilliams segregation units.   (*Id.*) McCloud received a call from Officer Perkins who advised that the inmates in segregation "were getting a little out of hand, beating the doors, yelling, screaming." (*Id.*)   Officer Perkins' report states that he notified McCloud at "1926 hours", or 7:26 p.m., that inmates were kicking at their doors.   (ECF 110–4 at 46.)   McCloud instructed Perkins "to go talk to them" and see if he could "get it calmed down" and that McCloud would meet him there.   (ECF 110–2 at 5.)   McCloud heard the "beating and banging" generated from the inmates "before I even got through the slider" in the segregation unit.   (*Id.*)   When he walked through the door to the unit, the other officers advised

7

McCloud that "they was [sic] flooding" in Plaintiff's pod.   McCloud "grabbed the OC, the Mark-9 and proceeded to pod 6 to see what was going on."   (*Id.*)   McCloud and the other officers entered pod 6.   Pod 6 had a dayroom and interior doors, behind which were inmate cells.   (*Id.*)   Plaintiff's and Mr. Stuckey's cells were behind "A door."   (*Id.*)   As Defendant McCloud entered pod 6, he saw water flowing out from underneath A door.   (*Id.* at 6.)

> A.      We proceeded to the A door, we got it open.   I walked through the A door and I could see water coming out from underneath Mr. Cedeal Harper's cell, and I could hear him in there flushing his commode.   So I proceeded to his cell, dropped the bean hole, gave him commands to stop flushing, he continued to flush.   I gave two bursts so he would cease flooding the pod any more and to get him to comply with my instructions.

(*Id.*)   Defendant McCloud confirmed that after the pepper spray was deployed, Plaintiff became compliant, was strip-searched, cuffed and shackled, and escorted to the multi-purpose room to for medical care.   (*Id.*)   Plaintiff was seen by a nurse at 7:54 p.m., who rinsed Plaintiff's eyes with an eye wash solution.   (ECF 110–4 at 47; ECF 110–1 at 11.)   Thereafter, Plaintiff was permitted to take a shower.   (ECF 110–1 at 11.)

Defendant McCloud testified that, in accordance with Policy Directive 312.02, he deemed Plaintiff's conduct to be a form of "passive resistance" that was not controlled by officer presence or verbal direction.   (*Id.* at 7.)   Thus, it was necessary for McCloud to implement a "soft intermediate control tactic" to "gain compliance with an order" and "prevent him from destroying state property, to get him to stop flooding his cell and the pod."[2]   (*Id.*)   Accordingly,

---

[2]      During discovery, Defendants produced the WVDOC policies and procedures concerning use of force. Policy Directive 312.02, which governs "Less-Lethal Use of Force," is offered as an exhibit in support of Defendants' motion for summary judgment.   (ECF 103, Exs. E and F.)   Policy Directive 312.02 defines "Force

McCloud elected to deploy Oleoresin Capsicum ("OC"), or pepper spray, into Plaintiff's cell, which resulted in Plaintiff's immediate compliance.   (*Id.* at 6–7.)

During Defendant McCloud's deposition, Plaintiff asked McCloud why he did not attempt to turn off the water in Plaintiff's cell rather deploy pepper spray.   This colloquy went as follows:

> Q.      Why didn't you just turn off my water?
>
> A.      Because at the time I didn't have the keys with me to shut your water off. Those keys are kept in the tower and officers don't carry those keys around with them.
>
> Q.      Which do you believe is more necessary and appropriate for the incident, OC or turning off the water?
>
> A.      At the time OC because it was what I had with me to get you to comply.

---

Continuum" as "a model to assist staff in designating appropriate conduct when selecting a level of control for use on a resisting inmate."   (*Id.* at 1.)   The policy directive further defines the following terms:

> One Plus One Theory:   A conservative force continuum theory which advocates that officers can use one level of control higher than the level of resistance used by the inmate.
>
> Resistance:   The force used by an inmate against the officer who is effecting an arrest or apprehension or otherwise engaged in the lawful performance of his/her assigned duties.
>
> Intermediate Control Tactics:   any divisionally approved tool or physical technique that may be utilized in gaining control of a non-compliant or combative inmate when verbal direction has failed and deadly force is not justified.

(*Id.* at 2.)   The policy directive also discusses, *inter alia*, various forms of resistance and the levels of control deemed to be appropriate to address such resistance.   (*Id.* at 4-8.)   The policy directive also includes a "Use of Force Model" which suggests appropriate control tools and techniques for certain generalized behavior.   (*Id.*)   The Use of Force Model states that "These are general guidelines and each situation should be assessed for the appropriate intervention strategy.   In all situations, verbal direction and efforts to temper should be attempted unless doing so would create a risk to the safety of persons involved."   (*Id.*)

9

Q.     When you seen there was water on the floor, why didn't you just go back and get the key and turn off the water if that was the cause of the problem?

A.     I proceeded into the problem to see what was going on.

Q.     So you didn't --

A.     I didn't know if you busted the sprinkler head.  I didn't know what was going on.  When I went behind the A door, I saw water coming underneath your door.

Q.     Did you make a determination that you wasn't going to go get the key, you was just–

A.     At the time I didn't have the key with me.   I wasn't going back to get the key.

Q.     Does Quilliams unit keep a key to turn off water in cases the need arises?

A.     In the control tower they do.

Q.     On the night of [the] incident, did you have ready available access to the key or could you obtain the key for the night of the incident?

A.     At the time I was going into the pod, no I didn't.
Q.     Why not?

A.     Because I never went into the control tower.

Q.     But when you see water on the floor, you didn't think to just take a second and–

A.     No.

(*Id.* at 9–10.)

   Although the decontamination process was video-taped, there is no recording of Plaintiff's conduct or the actual pepper spraying incident.   Defendant McCloud testified that the incident was not recorded because it was a spontaneous use of force, not a calculated one, as

addressed in Policy Directive 313.02.   (*Id.* at 16.)   Plaintiff also questioned Captain McCloud about his decision to use OC:

> Q.    When you were informed of the situation on the night of the incident, did you immediately grab the OC?
>
> A.    No sir.
>
> Q.    When did you determine OC was going to be needed?
>
> A.    When you walk in the unit, there was door kicking, so.
>
> Q.    So you had that with you when you came down?
>
> A.    When I got to the unit, yes, I had it with me.
>
> Q.    So when did you pick it up?   Where did you pick it up?
>
> A.    I picked it up from one of the officers that was working that unit that night.
>
> * * *
>
> Q.    On the night of the incident, did you assume you were going to need the OC or was you planning on using the OC?
>
> A.    I never plan on using it, unless, I have to.
>
> Q.    Did you assume you was going to need it?
>
> A.    No, I did not, but I take it with me.   Any time you go in the house when you're down there, somebody has OC with them.
>
> Q.    Why was the incident not taped?
>
> A.    Because it was spontaneous.   It was taped as soon as the situation allowed for it to begin videotaping.
>
> Q.    So you grabbed the OC but you forgot to grab your camera.

> [A.]  I don't ever grab the camera when I go in the pod unless it's a
> calculated use of force.

(*Id.* at 15–16.)

Deposition testimony was also offered by Officers Tim Perkins, Michael Bowe and Michael Jarosz, all of whom were on duty and present in the Quilliams II unit on the night of this incident.  Officers Perkins and Bowe were assigned to the night shift in the Quilliams II unit. Both testified that, as soon as they came on duty, the officers from the previous shift told them that the unit was being rowdy.  (ECF 110–4 at 13; 110–5 at 13–14.)  Officers Perkins and Bowe walked around the unit, which is the first step in de-escalating a situation through "officer presence."  (*Id.*, 110–4 at 14; 110–5 at 13–14.)  Both Officers Perkins and Bowe stated that there was a lot of loud yelling, and the unit was getting out of control, so they decided they needed to call Captain McCloud, who was the shift commander.  (*Id.*)

When Captain McCloud responded, he and Officer Perkins walked around the control tower to show their presence to the inmates.  (ECF 110–4 at 6.)  Normally, a show of officer presence causes the inmates to calm down, but it did not work in this instance.  (*Id.*)  McCloud and Perkins noticed water coming out from behind the glass in Pod 6.  (*Id.*)  Officer Perkins further testified that, when they discovered that the water was coming from cell 608, Plaintiff's cell, Officer Perkins yelled for Officer Bowe, who had stayed in the control tower, to shut off the water, while Captain McCloud was yelling at Plaintiff.  (*Id.*)

Officer Perkins testified that Captain McCloud gave Plaintiff several loud verbal commands to stop flushing his toilet.  (*Id.*)  When Plaintiff did not stop flushing, Captain

12

McCloud instructed Officer Perkins, who had the appropriate key, to open Plaintiff's food tray

slot.   (*Id.*)   Officer Perkins further testified:

> A.      I opened the food tray slot, that's when Captain McCloud deployed one
> one-second burst of pepper spray.   When he bent down to deploy the pepper
> spray I could see in the cell at this time.   And at this time I did observe Inmate
> Harper had a wet, white-colored cloth on his head, which we found out later to be
> it was a wet t-shirt.
>
>                                         * * *
>
> A.      When inmates act out they know that that's [pepper spray is] the first thing
> that we do to them after officer presence to stop them, and that's their way of
> counter-acting it.
>
>                                         * * *
>
> A.      Cedeal Harper turned and ran to the back of his cell and flipped his shirt
> up over his head to see, I guess, what we were doing.
>
>                                         * * *
>
> Q.      What happened next?
>
> A.      At that time he [Captain McCloud] sprayed one one-second burst of
> pepper spray.
>
> Q.      Okay.
>
> A.      And then he asked Inmate Harper if he was going to come out of his
> cell.   And he stated that he would.

(*Id.* at 7.)   Officer Perkins also followed up on his testimony about his request to Officer Bowe

to shut off Plaintiff's water.   He testified:

> A.       When I requested him to get the chase key and come into the pod, we
> went to the chase door that's right between Cell 607 and Cell 608.   At this time
> we found that there was not a valve there to turn off the toilet to 608, meaning we
> had to leave from behind the glass to go up a set of stairs to the chase directly
> above there to shut the water off.   And he shut the water off to four different

13

cells.   And I can't recall if he shut the water off or did not, because I'm not sure exactly when he got there, if it was before Inmate Harper had the OC deployed on him or after, I can't remember that.   I don't know.

Q.      But you do recall that when he got there that his initial attempt to shut off the water was unsuccessful.
A.      Yes sir.

(*Id.* at 8.)   In connection with Policy Directive 312.02, Officer Perkins described Plaintiff's level of resistance as an "aggravated act of aggression."   (*Id.* at 20.)

Officer Bowe testified that he could not recall whether he was told to turn off the water before Plaintiff was pepper sprayed but, under the circumstances, he could not get it shut off until after Plaintiff was sprayed.   He testified as follows:

Q.      So after you had taken him to the multi-purpose room, then you were informed to–

A.      Yes.

Q.      –to go shut off the water?

A.      Yes.

Q.      So this was the first time you were informed to go shut off the water?

A.      He might have told me before, I'm not 100 percent sure.   But with everything that was going on, I was more concerned about getting him out of the cell and getting him took over there to get looked at and everything, because OC can burn, and it's really a big irritant.

Q.      Is it customary for you to shut off - I mean, you've been involved in these type of situations before, is it customary for you to shut off the water after an inmate had been removed from his cell?

A.      Most of the time when I deal with it that's the way it's happened.   They might flood their cell.   It all depends, I guess, on the circumstances and how many officers you have.   If you don't have enough officers to pull the inmate out, then you go in, you shut his water off and you deal with it

14

> after that.   We pulled him out - he got sprayed, we pulled him out, and
> then that's when I went over to go shut the water off.   He was in the
> multi-purpose room being cleaned.
>
> Q.     Do you recall - I know it's been over a year now, but when you went to
>        shut off the water, was there any issues – do you recall if they had any
>        issues in trying to shut the water off?
>
> A.     I believe the biggest issue was trying to find the right valve.   You have
>        valves downstairs and valves upstairs, and only certain ones work for
>        certain things.
>
>                                      * * *
>
> Q.     Let me ask you this question.   So do you recall if you actually shut the
>        water off on that day?
>
> A.     I know I shut off both valves.    I pretty much took all the water away.
>
> Q.     And do you recall – and from your testimony earlier you recall shutting
>        off the valve after he was pepper sprayed?
>
> A.     Yes.

(ECF 110–5 at 6.)   Officer Bowe further testified that, even if the water is shut off, there is still

some water flow that would enable an inmate to continue flushing his toilet until the water within

the pipe is emptied.   (*Id.* at 6–7.)

Officer Jarosz testified that he ran the video camera to record the decontamination

process after Plaintiff was pepper sprayed.   He was not present and had no involvement prior to

Plaintiff being moved to the multi-purpose room.   (ECF No. 110–6 at 5.)   Officer Jarosz

testified that no recording of the actual incident took place because this was a spontaneous use of

force, and "generally . . . we don't have the cameras readily available because it is spontaneous.

We get the camera as soon as we possibly can."   (*Id.*)

*IV.     DISCUSSION*

A.     *Defendants' Motion for Summary Judgment—the Parties' Arguments*

1.     *Defendants' Motion for Summary Judgment*

Defendants assert that the use of pepper spray by Defendant McCloud on January 20, 2012, was a reasonable amount of force under the circumstances and was done in a good faith effort to restore order in the prison unit.   Accordingly, Defendants argue that Plaintiff cannot successfully establish that Defendants violated his Eighth Amendment rights.

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"   This is a low standard.   The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'"   *Id.* at 833.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.   The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   503 U.S. at 6.   The majority opinion noted that "[t]he

16

objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" 503 U.S. at 8 (citation omitted).

> In the excessive force context, society's expectations are different.   When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.   This is true whether or not significant injury is evident.   Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.   Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

> * * *

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind."

*Id.*, at 9–10 (citations omitted).   Near the conclusion of the opinion, Justice O'Connor wrote: "To deny, as the dissent does, the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the 'concepts of dignity, civilized standards, humanity and decency' that animate the Eighth Amendment."   *Id.*, at 11.

The *Whitley* case involved a riot at the Oregon State Penitentiary where a prison officer was taken hostage.   In an attempt to free the hostage, a plan was put in place for an unarmed prison security manager to enter the cell block where the hostage was being held, followed by prison officers armed with shotguns.   The security manager ordered one of the armed officers to fire a warning shot and to shoot low at any inmates found climbing the stairs in the direction of the security manager.   During this rescue attempt, one of the officers shot an inmate in the left knee.   The inmate filed suit in federal court, and at the conclusion of a jury trial, the district

17

court directed a verdict for Defendants.   The court of appeals subsequently reversed that ruling and remanded the case to the district court for a new trial.   The Supreme Court granted certiorari, and ultimately found no Eighth Amendment violation.

The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.   The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."   *Id.* at 321–22 (quoting *Bell v. Wolfish*, 441 U.S. at 547). Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to Plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury."   *Id.* at 322.

Defendants' argue:

> The infliction of pain in the course of a prison security measure does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable and hence unnecessary in the strict sense.   [*Whitley*, 475 U.S. at 319].   "Prison officials do not violate the U.S. Const. Amend VIII whenever it appears in retrospect that the infliction of pain during a security measure could theoretically have been avoided."   *Id.* at 319.   The U.S. Supreme Court has found that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."   *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed.2d 156 (1992).

(ECF No. 104 at 12.)

18

Defendants identify and discuss the five factors set forth in *Whitley* that must be weighed when determining whether force was applied in a good faith effort to maintain or restore order, or whether it was done so maliciously and sadistically for the very purpose of causing harm. (*Id.* at 13–16.)   The five factors identified by the Supreme Court to be used in making this determination are:   (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response.   *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996).   (ECF No. 104 at 13.)

Defendants address the *Whitley* factors as follows:

With regard to the first part of the test, it is clear that Plaintiff had intentionally created a disturbance in QII, pod 6, that had not only spread to additional pods in QII but also to pods in QI, by kicking his door and then began flooding his cell and pod 6.   Upon arrival at the door to Inmate Harper's cell, both Captain McCloud and Officer Perkins testified that Captain McCloud gave loud, clear, verbal commands to Plaintiff to stop flushing his toilet.   Plaintiff testified that he did not hear the loud audible alarm that sounded when the "A" door leading to the two cells "behind the glass" was opened to allow Captain McCloud to approach the door to Plaintiff's cell.   In fact, Plaintiff testified that he did not hear the food-tray slot, or "bean hole" open when Captain McCloud reached his cell.   After admitting that he heard none of the audible warnings that an officer was approaching, Plaintiff conceded that he had not heard them because of the noise caused by the disturbance he created and because he was focused on repeatedly flushing his toilet to continue flooding the pod.   Plaintiff also conceded that it is possible that he did not hear loud, clear, verbal commands given to him prior to the deployment of OC.

The need for the use of OC is clear.   Plaintiff was housed in the segregation unit of a maximum security prison.   Per policy, officers may not simply open a cell door and speak with an inmate or pull him away from the toilet.   Rather, prior to officers opening the door the inmate must cooperate in the strip out process.   Because Captain McCloud could not open the door, many

19

of the soft tactics were not viable options.   Without opening the door, Captain McCloud could not apply a pressure point hold, a joint lock or a K9.   Without the willing cooperation of Plaintiff, Captain McCloud could not apply mechanical restraints.   The only remaining options itemized on the Use of Force Model for the level of resistance offered by Plaintiff were the use of a Taser, the use of a Pepper Ball or a 12g/37 mm Specialty Impact.

(*Id.* at 13–14.)

Turning to the second factor, Defendants assert that "Captain McCloud used only that force which was reasonably necessary to obtain Inmate Harper's compliance and [to] prevent the destruction of state property."   (*Id.* at 14.)   Their memorandum further states:

Here, Inmate Harper stuffed an unknown item down his toilet and continuously flushed the same resulting in flooding of his cell and of the day room. Importantly, this court in *Lewis v. White*, 2010 U.S. LEXIS 65765 (S.D. W. Va. 2010) recognized an officer's use of OC – i.e. pepper spray and mace when an inmate (including an inmate in his cell) refused an order.   Other courts have extended the use of pepper spray and mace (as referred to in *Lewis*) on an inmate who refuses an officer's order . . . .

(*Id.* at 14–15.)   Defendants' memorandum contains a string citation of cases where the deployment of pepper spray was found to be a reasonable use of force.   (*Id.*)   In most of the cases, however, the inmates were out of their cells and were in proximity to correctional officers or other staff, thus placing at issue the immediate safety of those individuals.   (*Id.*)

Defendants assert that Plaintiff cannot produce any objective evidence to support the third factor concerning the extent of any injury related to the alleged use of force.   Although Plaintiff complained of irritations, swelling and headaches, Defendants assert that he was

immediately checked by medical staff and put through the decontamination process, and had no lasting injury.[3]   (*Id.* at 15.)

Concerning the fourth factor, Defendants argue that Captain McCloud reasonably perceived Plaintiff's conduct as a threat to the order and security of the prison because Plaintiff had already created a disturbance that carried over to other areas of the unit.   They further assert that clogging a toilet and repeatedly flushing and flooding a cell and the unit posed a risk of damage to the plumbing system and other State property.   (*Id.* at 15-16.)

Finally, with regard to the fifth factor Defendants claim that Captain McCloud "tempered his response."   (*Id.* at 16.)   Defendants contend that:

> In accordance with the Use of Force Model, Captain McCloud could have employed a tazer [sic; Taser], a pepper ball or could have employed a bean bag round fired from a shotgun.   Despite the more invasive, painful and extreme measures available, Captain McCloud chose to exercise the least amount of force by deploying, in accordance with policy, two (2) one-second bursts of OC.

(*Id.*)

In sum, Defendants assert that a proper weighing of these factors supports a finding that the deployment of pepper spray by Captain McCloud into Plaintiff's segregation cell was done in a good faith effort to maintain or restore discipline and order and was not done maliciously or sadistically for the very purpose of causing harm.   (*Id.*)

---

[3]     The Court notes, however, that, in *Wilkins v. Gaddy*, 559 U.S. 34 (2010), the Supreme Court clarified that an absence of serious injury is but one factor to consider in the analysis of whether force was used in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm.

Defendants further argue that Defendants are entitled to qualified immunity on Plaintiff's claims made against them in their individual capacities.   As noted in Defendants' memorandum:

> Qualified immunity is designed to protect public officials from the threat of litigation resulting from decisions made in the course of their employment.   *See Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995.)   In order to sustain a viable claim against a State agency or its employees or officials acting within the scope of their authority sufficient to overcome this immunity, it must be established that the agency employee or official knowingly violated a clearly established law, or acted maliciously, fraudulently, or oppressively.   *Parkulo v. W. Va. Bd of Probation*, 199 W. Va. 161, 483 S.E.2d 507 (1996).   In other words, the State, its agencies, officials, and employees are immune for acts or omissions arising out of the exercise of discretion in carrying out their duties, so long as they do not violate any known law or act with malice or bad faith.   *Id. syl. Pt. 8.*

(*Id.* at 16–17.)   Although Defendants have cited West Virginia case law, the federal authority on qualified immunity generally applies the same principles, establishing that "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998).

Defendants further assert that:

> In the instant action, it is clear that Captain McCloud clearly acted in accordance with the controlling WVDOC Policy, Policy Directive 312.02 and the attached Use of Force Model, when he sprayed Plaintiff with two (2) one-second bursts of OC.   Additionally, it is clear that Captain McCloud sprayed Plaintiff for the purpose of gaining compliance of the inmate and to prevent the inmate from destroying or damaging State property.

22

(ECF No. 104 at 17.)   Thus, Defendants contend that Plaintiff cannot establish any violation of a clearly-established constitutional right.   (*Id.*)

Defendants also argue that Defendants McCloud, Ballard and Rubenstein are also entitled to judgment as a matter of law because Plaintiff has not offered any evidence to demonstrate that, as supervisors, they were deliberately indifferent to a substantial risk of serious harm to Plaintiff and, thus, Plaintiff cannot demonstrate the elements necessary to establish supervisory liability.

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Court held that supervisors may be liable for the actions of their subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved prior constitutional violations. Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."   13 F.3d at 798 (quoting *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984).   As noted by Defendants, in *Shaw* the Fourth Circuit discussed the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

> 1)      The supervisor had actual constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> 2)      The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and
>
> 3)      There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

23

13 F.3d at 799.

      Defendants further state:

          In the instant action, Plaintiff has named Commissioner Rubenstein and Warden Ballard as Defendants, alleging that they failed to properly investigate, train, supervise and discipline the correctional officers involved.   By Order of February 19, 2013 [ECF 97], these Defendants produced Use of Force Review Committee reports related to all deployments of chemical agents in Quilliams I and Quilliams II from January 1, 2010, through March 6, 2012.   Additionally, in compliance with the same Order, the Court compelled production of all inmate grievances related to the deployment of chemical agents in Quilliams I and Quilliams II over the same period of time.

          Upon review of the documents produced in accordance with the Court's Order, it is clear that not only does the Warden ultimately receive a report on each such use of force, but that neither the Warden nor Commissioner would have any reason to know or suspect that Captain McCloud had used excessive force in the form of chemical agent, or that he would in the future.   In fact, not a single Use of Force Review Committee Report or inmate grievance identifies Captain McCloud as hav[ing] allegedly used a chemical agent against an inmate in QI or QII over the relevant time period.[4]

          Because Plaintiff cannot demonstrate any knowledge by either the Warden or the Commissioner to meet the first element of the *Shaw* test, the Court need not proceed to the second or third elements.   However, Plaintiff is unable to produce even a scintilla of evidence to support the second or third elements as well.

(*Id.* at 18-19.)

---

[4]   This statement by Defendants is inaccurate.   A review of the Use of Force Committee Reports produced by Defendants to Plaintiff during discovery indicates that Captain McCloud deployed pepper spray into the cell of another inmate who had flooded his cell in another pod of Quilliams II on the same date as the incident involving Plaintiff.   (*See* documents produced to Plaintiff in accordance with the Court's Order of February 19, 2013, Bates No. DEF00267-DEF00277.)   That non-lethal, spontaneous use of force was also found to be reasonable under the circumstances by the Use of Force Committee.   (*Id.* at Bates No. DEF00269.)   McCloud was also a shift commander on duty during other such incidents, but it does not appear that he was present at the time of any of those other incidents.   These documents were not docketed and are not presently part of the court's electronic record.

Concerning the deployment of chemical agents by officers other than Captain McCloud, Defendants contend that the Use of Force Committee reports were provided to the Warden and each report shows that the use of force was found to be justified.   (*Id.* at 19.)   Accordingly, Defendants assert that there was no evidence that would have given the Warden or Commissioner a reason to believe that correctional officers working in the segregation units at MOCC posed "a pervasive and unreasonable risk" to the inmates housed therein.   (*Id.*)

For the reasons stated, Defendants assert that there is no genuine issue of material fact, and they are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment and supervisory liability claims.

### 2.   *Plaintiff's Response*

On April 3, 2013, Plaintiff filed a responsive memorandum to Defendants' motion for summary judgment.   (ECF No. 115.)   In pertinent part, Plaintiff disputes Captain McCloud's and Officer Perkins' testimony that Captain McCloud gave him loud verbal commands to stop flushing prior to deploying the pepper spray.   Plaintiff also offers the testimony of inmate Lawrence Stuckey, who likewise insists that no verbal commands of any sort were given to Plaintiff prior to the deployment of the pepper spray.   Stuckey also testified that, in his experience, there have been prior incidents of cell flooding where officers would turn off the inmate's water, and that force was only used if the inmate refused to come out of his cell.

Plaintiff further contends that the alleged disturbance of kicking his door, stopping up his toilet, and flooding his cell "is not considered serious enough to warrant and/or did not warrant use of force."   (ECF No. 115 at 20.)   Plaintiff's Response further states:

25

> The reason why the force was used was allegedly because Plaintiff would not stop
> flushing his toilet allegedly after Captain McCloud gave loud, clear verbal
> commands.   First, when [the] case construing "good faith effort to maintain or
> restore order or discipline" they are talking about serious disturbances, such as
> those that pose[] "significant risk to the safety of inmates and staff," not a mop up
> job.   (See *Whitley v. Albers, supra*; *see generally*.)   In other words, this was not
> a riotous affair or anything remotely similar but a bunch of water on the floor,
> which could have been cleaned up.   This type of disturbance is not enough to
> constitute a significant risk to the inmates and staff safety.   The use-of-force was
> used for non-prison security reasons.

(*Id.* at 20.)

Plaintiff further asserts that the officers present at the time of this incident could have

avoided the use of force by shutting off the water to Plaintiff's cell.   (*Id.* at 20-21.)   Officer

Bowe testified that he was asked to shut off the water to Plaintiff's cell, but he cannot recall

whether the request was made before or after the deployment of the pepper spray into Plaintiff's

cell and, at any rate, the water was not shut off until after Plaintiff was pepper sprayed.   (ECF

No. 110–5 at 6.)   Plaintiff argues:

> However, instead of just turning off the water, which would have prevented or
> made use-of-force no need, officer or Captain McCloud grabbed the OC and
> proceeded to pod six.   After Captain McCloud was informed of the flooding he
> did not grab the key to turn off the water, which is in the same area, or better yet,
> Officer Bowie [sic; Bowe] had in his possession, but instead (1) grabbed the OC
> and proceeded to pod six, (2) allegedly gave verbal commands for me to stop
> flushing my toilet, and (3) after Plaintiff's alleged refusal to stop flushing his
> toilet, (4) pow, pow, allegedly two one-second burst[s] of OC from the MK9.
> Clearly, the option was there to turn off my water but instead Captain McCloud
> choice [sic; chose] a more forceful approach to get Plaintiff to stop flushing my
> toilet so water would not get on the floor.

(ECF No. 115 at 21.)

Plaintiff further asserts that, if Officer Perkins' testimony that Plaintiff ran to the back of

his cell after the first burst of pepper spray is to be believed, then the second burst was excessive

26

and unnecessary because Plaintiff was obviously no longer flushing his toilet.   (*Id.* at 22.)

Plaintiff argues that the use of pepper spray was unnecessary under WVDOC Policy Directive

312.02.   More particularly, Plaintiff contends:

> Policy Directive 312.02 (V)(Procedure)(B) Force Continuum is defined as [a] model to assist staff in designating appropriate conduct when selecting a level of control for use on a resisting inmate.   The one plus one theory is a conservative force continuum theory which advocates that officers can use one level of control higher than the level of resistance used by the inmate (which would allow an officer to use more force than necessary.)   However, the only way the one plus one theory would not be appropriate is if the variable would affect the common sense of the officer.   Policy defines resistance as the force used by an inmate against the officer who is effecting an arrest or apprehension or otherwise engaged in the lawful performance of his/her assigned duties.   There are four types of resistance:   (1) passive resistance; (2) defensive resistance; (3) active aggression; (4) aggravated active aggression.   Policy 312.02 has (5) levels of control which may be used which are: (1) officer presence; (2) verbal direction; (3) intermediate control tactics soft; (4) intermediate control tactics hard; (5) use of deadly force.   Intermediate control tactics is any divisionally approved tool or physical technique that may be utilized in gaining control of a non-compliant or combative inmate when verbal direction has failed and deadly force is not justified (which should properly state when or what non-compliant or combative means and verbal directions that are to insure the safety and health of an inmate, person or staff.)

> Using the Use of Force Model, Defendant McCloud testified that Plaintiff's refusal to stop flushing his toilet fell under the upper most left box in the Use of Force Model.   Additionally, Defendant McCloud testified that Plaintiff was displaying passive resistance.   Defendant McCloud testified that Plaintiff was sprayed to maintain compliance with the order to stop flushing his commode and in a good faith attempt to restore order.   Defendant McCloud testified that chemical agents or OC is considered a soft tactic.

(*Id.* at 22.)   Plaintiff argues that he was not demonstrating passive resistance as it is defined in

the Policy Directive, which contemplates a more direct interaction with the inmate, such as an

inmate who goes into a "dead weight" posture in a resistance to be moved from his cell.   (*Id.* at

23–24.)   Plaintiff further asserts that the circumstances under which he was pepper sprayed

were not contemplated in the Use of Force Model.   Plaintiff contends that Captain McCloud "is attempting to pass off guidelines and situations that [do] not match his own allegations."   (*Id.* at 24.)

Plaintiff further argues that Captain McCloud never made any efforts to temper the situation prior to deploying the pepper spray.   (*Id.* at 25.)   He states:

> Captain McCloud never made any efforts to temper the severity of a forceful response.   Captain McCloud never considered using no force to achieve their goal of stopping Plaintiff from (1) causing a disturbance, (2) clogging his toilet and/or to "maintain order" or "gain compliance."   Captain McCloud testified that "on my way down the hall I could hear the beating and banging out in the hallway before I even got to the slider in Q2.   So I walked through the door.   I met with the officers.   At that time they instructed me that they was flooding in pod 6.   We grabbed the OC, the Mark-9, and proceeded into pod 6 to see what was going on."   Captain McCloud never thought to grabbed [sic; grab] the key or even considered grabbing the chase key to turn off the water, even though he knew flooding was happening in pod 6.

(*Id.*)

Plaintiff contends that, based upon the evidence produced, "it is clear that Plaintiff states a valid claim or it is at least debatable amongst juries and Captain McCloud did not employ force in a good faith effort to maintain or restore discipline but for the very purposes of causing harm in a maliciously and sadistic manner."   (*Id.* at 27.)   Accordingly, Plaintiff asks that the Court deny Defendants' motion with regard to the Eighth Amendment claim against Defendant McCloud.   (*Id.*)

Turning to the claims of supervisory liability against Defendants, Plaintiff contends that all three Defendants had actual knowledge of the pervasive and unnecessary use of force at MOCC and that they failed to investigate, take corrective action against, train, supervise or

discipline their employees who have engaged in such unreasonable use of force.   (ECF 115 at 29.)   In support of his claim, Plaintiff relies upon other incident reports that were reviewed by the Use of Force Committee concerning the deployment of chemical agents in the segregation units at MOCC between January 1, 2010, and March 6, 2012.   Plaintiff's Response summarizes a number of those incidents as follows:

> The majority of the cases state the cause for use of force such as but not limited to:   (1) prevent destruction of property; (2) prevent inmate from harming himself; (3) prevention of assault.   It should be noted that in most cases the officer don't [sic; doesn't] state the cause and the cause is first mentioned by the supervisor.   Most officer[s] don't report the cause.   However, most of the use-of-force cases are based on the rationale that the actual situation is one which could develop into, although it had not yet become, one which the use of [chemical] agents is possibly permitted.   Most of the use-of-force incident[s] occur behind locked doors, which Policy 312.02 conveys the level of control an officer may use after a level of resistance is displayed by the inmate, as defined by policy.   In most of the cases, the officer who used the force did not state the level of control used and the level of resistance faced, as required by Policy 312.02. Officers, in all cases, are not facing any form of resistance and exceeded the level of control needed, as defined by Policy 312.02.   In most cases, there [was] no safety [issue] or threat faced by the officer, from an inmate, and [force] was not used to maintain and restore order but for the malicious and sadistic [purpose] of causing harm.   In all cases the officer never used calculated force but instead use[d] "spontaneous force" which is not allowed by policy.   In some cases, the nurse never report[ed] the extent of the inmate's injuries, adequately and properly. In most, if not all, the force was excessive and or unnecessary.   Most of the cases involve actions which are suspicious.

(ECF 115 at 30.)   Plaintiff then goes on to describe six individual incidents involving the deployment of pepper spray, all of which were upheld by Warden Ballard as being reasonable uses of force.   (Id. at 31–37.)

Based upon these reports, Plaintiff summarily concludes that the Warden and Commissioner had reason to know or suspect that officers working in the segregation units at

MOCC had violated prison policy and used excessive force on inmates, in violation of their constitutional rights.   (*Id.* at 38.)   Plaintiff further contends that the investigation of these incidents was improper and inadequate and conducted in an effort to cover up constitutional violations against the inmates involved.   (*Id.*)   Accordingly, Plaintiff asserts that he will be able to establish that Warden Ballard and Commissioner Rubenstein were deliberately indifferent to a substantial risk of serious harm to Plaintiff and to other inmates and, therefore, Defendants' Motion for Summary Judgment should be denied.   (*Id.* at 39.)

   *3.     Defendants' Reply*

   On April 30, 2013, Defendants filed a Reply memorandum.   (ECF No. 118.)   First, Defendants assert that pages 21–40 of Plaintiff's Response should be stricken as exceeding the 20-page limit set forth in Local Rule 7.1 of the Local Rules for the United States District Court for the Southern District of West Virginia.   Because Plaintiff's Response addresses multiple claims against three Defendants and because Plaintiff is proceeding *pro se*, the Court grants Plaintiff leave to exceed the page limit.   Accordingly, Defendants' request to strike pages 21–40 of Plaintiff's Response is denied.

   Defendants' Reply reiterates their argument that the use of force by Defendant McCloud in this case was proper under *Whitley v. Albers*, *supra.*   (ECF No. 118 at 2.)   Defendants further assert that Plaintiff has improperly attempted to limit the application of the Supreme Court's analysis in *Whitley* to instances involving a prison riot.   (*Id.* at 2–3.)   Defendants argue:

   Important to the case at bar is the United States Supreme Court's holding that "where a prison security measure is undertaken to resolve a disturbance, such

30

as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."   *Id.* at 320–21 (internal quotations omitted.)

(*Id.* at 3.)   Defendants further emphasize the following statement of the Supreme Court in

*Whitley*:

When the "ever-present potential for violent confrontation and conflagration," *Jones v. North Carolina Prisoners' Labor Union, Inc.* 433 U.S. 119, 132 (1977), ripens into *actual* unrest and conflict, the admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," *Rhodes v. Chapman*, *supra*, at 349 n.14, carries a special weight. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain internal security."   *Bell v. Wolfish*, 441 U.S. at 547.   That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.   It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

475 U.S. at 321-22.   (ECF No. 118 at 3.)

Defendants point to the testimony of the correctional officers concerning the risks posed

by an inmate flooding his cell.   (ECF No. 118 at 4-5.)   Captain McCloud testified as follows:

Q.    What are the dangers of an inmate flooding his cell and the surrounding area?

A.    Dangerous to the officer walking through the pod because it makes the floor very slick.   He [sic; The] problem you have in Q2, not only when they flood upstairs, it goes downstairs into Q1 and can flood the other tier, which creates another problem for the officers working down there.   And it can go into other inmates' cells, and it just causes you more problems because now they're having water in their cell, destroying stuff.

31

(ECF 110–2 at 8.)   Defendants also rely upon the testimony of Officers Jarosz and Perkins, who focused on the fact that the water from the toilet can pose a biohazard.   (ECF 110–4 at 7, ECF 110–6 at 8.)

Defendants' Reply further emphasizes the fact that merely shutting off the water would not have immediately halted Plaintiff's ability to continue flooding his cell because water remains in the pipes.   (ECF 118 at 7, citing Bowe Depo., ECF 110 at 6–7.)   Defendants also dispute Plaintiff's assertion that it was unnecessary for Captain McCloud to deploy the second burst of pepper spray.   Captain McCloud testified that Plaintiff continued to flush his toilet, even after the first burst of OC was deployed, and there is no evidence that Plaintiff's compliance was gained prior to the deployment of the second burst of OC.   (ECF 118 at 7.)

Defendants' Reply further focuses on Plaintiff's challenge to Captain McCloud's characterization of Plaintiff's conduct as "passive resistance" necessitating a soft intermediate control tactic.   Defendants assert that "Plaintiff completely ignores the fact that the act of pushing towels into the toilet while contemporaneously flushing the same constitutes a physical action as contemplated by Section D(1)(a)" of Policy Directive 312.02.   (ECF 118 at 8.) Defendants also assert that the Use of Force Model is a general guideline and does not incorporate every possible act of resistance or variable of behavior.   (*Id.*)

Defendants' Reply also repeats their argument concerning Plaintiff's inability to establish supervisory liability in this case.   (*Id.* at 13-15.)   Defendants maintain that Plaintiff has "cherry-picked" documents upon which he relies to assert that other pepper spray incidents were unnecessary or excessive, stating that, "Plaintiff has ignored the fact that in any of the incidents

document[ed] in the documents produced, none of the officers involved were found to have applied force in an excessive manner by the Use of Force Committee."   (*Id.* at 14.)   Moreover, Captain McCloud, whose conduct is at issue in the instant case, has never been found to have used force that was inappropriate, unjustified or unnecessary.   (*Id.*)

Defendants contend that Plaintiff has failed to produce any evidence proving that the training that Captain McCloud, or that of any of the officers whom he, or Defendants Ballard and Rubenstein supervised, was inadequate.   (*Id.*)   Defendants emphasize that, in *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983), the Fourth Circuit held that "a failure to supervise gives rise to § 1983 liability . . . only in those situations in which there is a history of widespread abuse."   (*Id.* at 15.)   Defendants contend that Plaintiff has failed to establish such a history concerning the use of pepper spray in the segregation units at MOCC.   Accordingly, they assert that they are entitled to judgment as a matter of law on Plaintiff's supervisory liability claims as well.   (*Id.*)

B.      *Analysis*

The Court cannot find that the undisputed evidence, when viewed in the light most favorable to Plaintiff, supports a reliable inference that Defendants engaged in wantonness in the infliction of pain under the standards set forth in *Whitley*.

Plaintiff's excessive force claim boils down to these undisputed facts: Plaintiff, who has a significant history of prison rule violations, was being held in punitive segregation at a maximum security prison for failing to abide prison rules.   Inmates in punitive segregation have reduced privileges, including reduced access to personal materials.   Plaintiff wanted the guards to bring

33

him some of his legal papers.   He started repeatedly kicking at his cell door to gain the attention of the guards.   The disturbance sparked other inmates to kick at their doors and the ruckus spread to other sections of the prison.   Two guards responded and spoke with Plaintiff.   The guards told Plaintiff that they could not give him the materials he wanted and then departed.   In protest, Plaintiff resumed kicking at his door.   Then, he stuffed a towel down his cell toilet and repeatedly flushed the toilet causing the toilet to overflow.   Not only did this result in the flooding of his cell, but also caused unsanitary toilet water to flow out into other areas of the pod. When Captain McCloud responded to the scene, he deployed two one-second bursts of pepper spray into Plaintiff's cell through the food tray slot to stop Plaintiff from continuing with his conduct.   Plaintiff was then taken to see a nurse within less than a half-hour of being sprayed. The nurse rinsed out Plaintiff's eyes with an eye-wash and, thereafter, Plaintiff was permitted to take a shower and his cell was decontaminated.

On these facts no rational trier of fact could find in Plaintiff's favor respecting his Eighth Amendment excessive force claim.   The Court rejects Plaintiff's contention that the evidence supports a reasonable inference that Defendant McCloud's use of pepper spray was not a good faith effort to restore order.   (ECF 115 at 10.)   Moreover, Plaintiff has failed to set forth specific facts showing that Defendants acted maliciously and sadistically for the purpose of causing him harm.

The Court's determination is guided by the five factors under *Whitley*, that is, (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible

34

official; and (5) any efforts made to temper the severity of a forceful response.  *Whitley*, 475 U.S. at 321.   In considering these factors, the Court is further guided by *Whitley's* admonition that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."   *Id.* at 322.

Notably, Plaintiff has abandoned the allegation that he made in his Complaint about the length of time he was sprayed with pepper spray.   Plaintiff stated in his Complaint that Defendant McCloud sprayed him twice.   (ECF 2 at 10.)   He did not estimate the length of the first burst, but claimed that he was sprayed a second time for about minute and a half.   In his response to Defendant's summary judgment motion, Plaintiff states "[b]ecause the force of spraying the Plaintiff with two (2) one-second bursts of [OC] was not applied by Capt. McCloud in a good faith effort to restore order, the Defendant's [sic] Summary Judgment [motion] should be denied."[5]   Thus, Plaintiff's main contention is that he should not have been sprayed at all— not that the amount of pepper spray deployed was excessive.   (*Id.*)

---

[5]   This decision may have been the consequence of Plaintiff's deposition testimony.   During his deposition, Plaintiff backed significantly off that time estimate.   In response to questions about the length of the first OC burst, Plaintiff testified as follows:

> A.   To [the] average human it seemed like forever, but to me it was like a minute, to me it was, it felt long.   I guess with the adrenaline rush and everything, it just feels long, you don't necessarily calculate the time that's involved in it.
>
> Q.   You understand a minute is 60 seconds?
>
> A.   Yes.
>
> Q.   Do you believe you were sprayed the initial push of the button was 60 seconds long?
>
> A.   No.

Q.      With regard to the second spray, how long do you think it lasted?   When I say second spray, I mean the second time he pushed the button, how long do you think that lasted?

A.      Probably 10 seconds, 8 seconds, I don't know.   It felt forever.   I guess it's just the experience.

Q.      Do you have any reason toe [sic] believe that it wasn't two one-second bursts?

A.      Yeah, it was kind of long for a second.   I don't know, I guess you have to do a scientific analysis on that, but it was kind of long for a minute—I mean for a second.   I mean, like, it was kinda long for a second.

Q.      Did you see more than one projector with him?

A.      No.

Q.      You certainly aren't in a position to testify that an MK-9 holds a minute to a minute and a half of spray, are you?

A.      No.

Q.      You never saw him switch cans?

A.      No.
Q.      So is it your understanding that he sprayed from a single container?

A.      I guess, if that's what he claims he used.

Q.      If a single container holds less than 20 seconds of spray, he would have had to spray you for less than 20 seconds; correct?

A.      Yes.

Q.      If a single container holds less than 10 seconds of spray, he would have had to have sprayed you for less than 10 seconds; correct?

A.      If a single can?

Q.      If a single can holds less than 10 seconds of spray, he would have had to sprayed you for 10 seconds or less; correct?

A.      Yes.

Q.      So if your complaint says one minute to one and a half minute, you don't now believe that to be— as far as being a 60-second minute, you don't believe that to be accurate?

A.      No.   If that all the container holds, no, that's impossible.   I guess as a human it feels like forever, like if you get hit it just feels like it takes forever.   Felt like a minute, like more than that.

36

Turning to the *Whitley* factors, the first factor focuses on the need for application of force.   There is no dispute that Plaintiff created a disturbance in the prison.   Although there is evidence that other inmates were also kicking at their doors, there is no dispute that Plaintiff's conduct inspired other inmates to start kicking at their doors and caused the disturbance to spread to other areas of the prison.   Plaintiff's and the other inmates' conduct created a lot of noise. Two guards responded to Plaintiff after he started kicking his door and spoke with him.   After being told he would not be given his papers, Plaintiff flooded his cell in protest with toilet water. There was so much water that it spread beyond Plaintiff's cell into the dayroom area of his pod. The toilet water created slippery floors and posed a biohazard, thus creating a safety and health risk to the guards and other inmates.

By Plaintiff's own admission, he did not see or hear Defendant McCloud enter his area or hear him open "the bean hole" because of the level of prison noise and because he was so intently focused on flushing his toilet.   The Court notes that there is a significant dispute—the only real factual dispute in this case—between Plaintiff and Defendants on the question of

---

Q.      I understand that.   I guess my question is, you will concede that your perception of time while being sprayed may not be accurate to the actual seconds ticking by?

A.      According to how long that it can be administered, it could be inaccurate.

Q.      It could have felt like a minute but not have been a minute?

A.      Yeah.

((ECF 110–1 at 9–10.)   Defendants submitted testimony and documentary evidence that showed that the OC canister McCloud used, the MK–9, which sprays a fog rather than a stream, had a maximum capacity of "six to eight one-second bursts.   (ECF 110-2 at 8 and 32.)

whether Defendant McCloud ordered Plaintiff to stop flushing his toilet before deploying the pepper spray.

This factual dispute, however, is not material.   The Court must assume at this juncture the truth of Plaintiff's contention that McCloud did not give a verbal cease and desist command. This assumed fact, however, simply does not create a reasonable inference that Captain McCloud acted maliciously and sadistically to cause Plaintiff harm.   It is not disputed that Captain McCloud and the other guards responded to a loud, rebellious, and escalating disturbance in the punitive segregation wing of a maximum security prison.   By Plaintiff's own admission, the disturbance was fomented, in part, by Plaintiff.   Captain McCloud's failure to give verbal orders to Plaintiff to refrain from his disorderly conduct prior to deploying pepper spray, arguably, violated Policy Directive 312.02.   Importantly, by their terms Policy Directive 312.02 and its Use of Force Model are "general guidelines" and correctional officers are to assess each situation "for the appropriate intervention strategy."   (ECF 103 at 4–8.)   While this Policy Directive states that verbal direction and an effort to temper should be attempted unless doing so would create a safety risk, the Use of Force Model also emphasizes that "[e]scalation through lower levers of control is not required and may result in unnecessary danger to the officer or others" and that the recommended "One Plus One" graduated model for use of force would not be appropriate if a "variable would affect the common sense of the officer."   (ECF 103–5 at 4.) Here, Captain McCloud was confronted with an unruly inmate with a history of disobeying prison rules and with escalating disorder in the prison's lock-down unit.   Captain McCloud made a common sense, split-second judgment on how best to restore order.   On this record, the

38

undisputed evidence does not give rise to a reliable inference that the force applied by Defendant McCloud was wanton or sadistic or inflicted for the purpose of causing pain; rather, the only reliable inference from the evidence is that Defendant McCloud's conduct was a good faith attempt to effectively and immediately restore order.   The Eighth Amendment is not offended on these undisputed facts.

Plaintiff contends that an alternative to the use of force was available, namely, Defendants could have turned off the water to his cell.   Plaintiff urges the Court to find that, because of this alternative, McCloud's use of force was *per se* excessive.   The Court declines Plaintiff's invitation to get into the business of setting prison policies or practices.   Indeed, the Supreme Court has cautioned courts on interfering with the adoption and execution of prison policies and practices.   *Bell v.* Wolfish, 441 U.S. 520, 547 (1979) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions.   Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.")   The undisputed evidence here is that the guards would have had to go to the prison tower to obtain the key to the cabinet where the shut-off valves for the water pipes were located.   Additional time would have been needed to locate the specific pipe valve for Plaintiff's cell.   There is evidence that in the midst of this incident Defendants were, in fact, scrambling to figure out how to have the water to Plaintiff's cell turned off.   Under the facts of this case, Defendants acted within the bounds of the their broad discretion by determining that use of the OC pepper spray on Plaintiff was the best way to

39

diffuse the unrest that night and effectively and efficiently restore order in what was a rowdy and understaffed prison segregation unit.

This conclusion is all the more compelling when the inmate causing the damage was utterly and energetically engrossed in his destructive activities and where his misconduct had created so much noise that he, by his own admission, was possibly unable to hear the officers communicate with him.   Moreover, "[t]he infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."   *Whitley v. Albers*, 475 U.S. at 319.   The Court has little difficulty finding that there was a justifiable need for application of some level of force, and there is no genuine issue of material fact on this point.

The second *Whitley* factor—the relationship between the need for force and the amount of force used—plainly favors Defendants.   Plaintiff does not now appear to dispute that Defendant McCloud administered two one-second bursts of OC through "the bean hole" into Plaintiff's cell.   This was a measured response under the facts of this case.

In connection with this second factor, the Court notes that the parties have expended much attention in their arguments on Mt. Olive Policy Directives, particularly Policy Directive 312.02.   Even assuming that Defendants varied from the rules set forth in Directive 312.02, any such variance does not *per se* establish a violation of Plaintiff's constitutional rights.   To be sure, compliance with the Policy Directives may in certain circumstances be instructive on whether Defendants acted in good faith and whether they are entitled to qualified immunity.

40

They do not, however, establish constitutional minima.  *Cf. Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) (noting that correctional standards recommendations by various organizations and associations "may be instructive in certain cases" but that "they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.").

Policy Directive 312.02, a West Virginia Division of Corrections directive applicable to the Mt. Olive prison, "delineates appropriate *guidelines* concerning the use of physical, less-lethal force by division personnel."   (ECF 110-4 at 31) (emphasis added).   It is a "model to assist staff in designating appropriate conduct when selecting a level of control for use on a resisting inmate."   (*Id.*)   The "Use of Force Model" emphasizes that "[t]hese are *general guidelines and each situation should be assessed for the appropriate intervention strategy.*   In all situations, verbal direction and efforts to temper should be attempted unless doing so would create a risk to the safety of persons involved."   (*Id.* at 41) (emphasis added).   As Plaintiff points out, application of this Policy Directive to the facts of this case is not a square fit because Plaintiff was not, according his version of events, being non-compliant or directly combative with a guard.  (ECF 115 at 24.)   The undisputed evidence is, however, that Plaintiff was engaged in misconduct that impacted the security of prison property, created a risk that guards and other prison personnel could slip and fall, created biohazards, and instigated further inmate unrest.

Policy Directive 312.02, while not, perhaps, a square fit is nonetheless a resource that offers analogous guidance for a correctional officer's measured response to regain control of a

41

disturbance in the prison.   Where the conditions were such that Plaintiff's awareness of the presence of the guards and his ability to hear verbal commands were compromised by his own misconduct, an appropriate escalation in the force continuum under Policy Directive 312.02 would have been deployment of a chemical agent, a Taser, and use of a pepperball gun, among other possibilities.   The evidence does not reasonably support an inference that Defendant McCloud's use of pepper spray violated Policy 312.02—or, more importantly, was an unconstitutionally disproportionate response to Plaintiff's misconduct.   As to this second factor, there is no genuine issue of material fact.

The third *Whitley* factor—the extent of injury—also favors Defendants.   Plaintiff testified that after the incident he had burning eyes and nasal congestion. (*Id.* at 11–12.)   He claimed his face was swollen face for up to a week, had trouble sleeping for a couple weeks, and had bad dreams (*Id.*)   He claimed that because his cell had not been properly cleaned he felt "after effects" a "couple of times" when he used his towels and his toothbrush.   (*Id.* at 12.) Plaintiff testified that he has not suffered any permanent injury as a consequence of the pepper spray.   (ECF 110–1 at 12.)   The undisputed evidence is that any injuries were temporary and this factor is unhelpful to Plaintiff.

The threat reasonably perceived by Defendants—the fourth *Whitley* factor—also favors Defendants.   Here, the undisputed history of Plaintiff is relevant.   Plaintiff is an inmate in a maximum-security facility.   He is serving a sentence of fifteen years to life for first-degree murder.   (ECF 110–1 at 4.)   Plaintiff, originally from Detroit, Michigan, relocated to Huntington, West Virginia in April 2004 for the purpose of "drug dealing."   (*Id.*)   The murder

42

for which Plaintiff was convicted occurred in Huntington, West Virginia.   (*Id.*)   The exact date of the murder is not a part of the record, but Plaintiff was sentenced for that crime by the Circuit Court of Cabell County, West Virginia in April 2006. *See* www.wvdoc.com/wvdoc/OffenderSearch/tabid/117/Default.aspx.

In addition to serving a lengthy sentence for a violent crime, Plaintiff has a history of violating prison rules.   Following his arrest for the murder, Plaintiff was temporarily housed in state jail facilities and later transferred in February 2008 to the Mt. Olive prison.   (ECF 110–1 at 4.)   Plaintiff has a record of misbehavior while he has been in the custody West Virginia detention facilities.   More particularly, in 2007 Plaintiff was "written up" on two occasions, one for "insubordination" and the other for fighting.[6]   (*Id.*)   In 2008, Plaintiff was found guilty of refusing an order.   (*Id.* at 4–5.)   In 2010, he was found guilty of exposing his penis to a female correctional officer at Mt. Olive.   (*Id.*)

Plaintiff has spent, by his estimation, "probably half" of his time in prison in the segregation unit of Mt. Olive.   (*Id.* at 6.)   On the night of the pepper spray incident, Plaintiff was in the punitive segregation section of the prison.   Mt. Olive imposes restrictions on the amount of personal property inmates in punitive segregation may have.   (*Id.* at 7.)   Plaintiff testified about why he was in the segregation wing.   He stated, "I think I had disciplinary write-ups.   I can't remember why I was back over there.   I think I got wrote up for something. I'm not really sure.   I can't remember.   I don't recall, but I think I was written up."

---

[6]  Plaintiff objected during his deposition to the question whether he was charged with causing a disturbance in 2005 at the Western Regional Jail and refused to answer the question.   Accordingly, the Court has not considered this fact in its analysis.

Thus, the Defendant guards had good reason to approach Plaintiff with particular care and good reason to expect that Plaintiff, assuming he could hear them, would likely not readily accede to their orders.   Plaintiff was contained in his cell and, thus, there is little likelihood that Plaintiff posed a risk of assault to the Defendant guards.   The guards, however, responded to a volatile situation without the benefit of knowledge learned in hindsight.   As previously noted, the toilet water on the floor was unsanitary and created a biohazard, made the floors slick, and presented the risk of damage to prison property.   Plaintiff's actions caused significant flooding not just to his cell but to the common area of the pod.   In Captain McCloud's judgment, the fastest way to stop the flooding was to incapacitate Plaintiff.   The Court will not second-guess that judgment with the luxury of informed hindsight on the facts of this case.   There is no genuine issue of material fact that Defendants reasonably perceived a threat in this situation.

The final *Whitley* factor is the efforts that were made to temper the severity of a forceful response.   Captain McCloud elected to use pepper spray rather than more forceful measures such as prodding Plaintiff with a Taser or blasting him with a beanbag from a shotgun.   Also, there is no dispute that within minutes of the incident Plaintiff was removed from his cell and attended to by a nurse, who rinsed out Plaintiff's eyes with an eye-wash.   He was also permitted to take a shower.   Plaintiff does not dispute any of these facts.   These undisputed facts also strongly support the proposition that Defendants did not act maliciously or sadistically.

Having considered the facts in the light most favorable to Plaintiff, the Court concludes he has failed to adduce specific facts showing that there is a genuine issue for trial.   There is no genuine issue of material fact, the *Whitley* factors all favor Defendants, and Defendants are

therefore entitled to summary judgment.   Notably, in his Response Plaintiff identifies no reliable evidence that would support a reasonable inference that Defendants' actions were wanton and malicious.   Defendants have, as a matter of law, satisfied their burden to establish the absence of evidence to support Plaintiff's Eighth Amendment claim.   Summary judgment in favor of Defendants is appropriate because, as discussed above, Defendants have shown that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law.   Accordingly, the Court **GRANTS** Defendants' motion for summary judgment.

Because there is no meritorious excessive force Eighth Amendment claim, Plaintiff's allegations of supervisory liability necessarily fail.   Similarly, in light of the Court's rulings, Plaintiff's motion for leave to amend his Complaint [ECF 99], which seeks to add two of Defendant McCloud's supervisors as Defendants, is **DENIED** because the amendment would be futile.

## V.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' motion for summary

judgment [103], **DENIES** Plaintiff's motion to amend his amended Complaint [99], **DISMISSES** this case, and **DIRECTS** the Clerk to remove this case from the Court's Docket.

      **IT IS SO ORDERED**.

      The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                      ENTER:       March 21, 2014

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE